

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-17-00410-CV

———————————————

## ESTATE OF RANDALL CROSS STEGALL, DECEASED

On Appeal from Probate Court No. 1
Tarrant County, Texas
Trial Court No. 2013-PR00717-2-1-A

Before Kerr, J., and Gonzalez, J.[1]
Memorandum Opinion by Justice Kerr

---

[1]The Honorable Ruben Gonzalez, Judge of the 432nd District Court of Tarrant County, sitting by assignment of the Chief Justice of the Texas Supreme Court pursuant to Section 74.003(h) of the Government Code. *See* Tex. Gov't Code Ann. § 74.003(h).

Justice Mark T. Pittman was a member of the original panel but has since resigned. Therefore, the two remaining justices decided the case. *See* Tex. R. App. P. 41.1(b).

# MEMORANDUM OPINION

When Priscilla Stegall's husband died in 2013, she was appointed independent executor of his estate. In that capacity, she sold her late husband's law firm, which included a title company, to the two attorneys who had been working at the firm when he died. After the sale, Priscilla continued to work at the law firm as its office manager and as an escrow officer. The firm's new owners fired her several months later, and she sued them, the law firm, and the attorneys who had represented her and the estate in the sale of her late husband's firm. The probate court granted summary judgment against her on all claims and entered a take-nothing judgment. In five issues, Priscilla challenges the probate court's subject-matter jurisdiction and the propriety of its summary-judgment rulings. We will reverse and remand in part and affirm in part.

## I.
## Background

Priscilla was married to Randall Cross "Randy" Stegall, an attorney and the sole manager and member of The Stegall Firm, PLLC. The Stegall Firm had offices in Southlake and Flower Mound and operated both a law firm and a fee office for a title company. Priscilla, a nonlawyer, worked for the Stegall Firm as its office manager and as an escrow officer. According to her, most of the Stegall Firm's revenue came from the its title business. Attorneys Matthew Schultz and Dustin Kellar started working for the Stegall Firm shortly before they became licensed in November 2012.

On February 27, 2013, Randy died unexpectedly. His will named Priscilla as the estate's executor and sole beneficiary. Tarrant County Probate Court Number Two appointed Priscilla as the independent executor of Randy's estate.

On Randy's death, his estate became the Stegall Firm's sole member. But because Priscilla is not an attorney, no ownership interest in the firm could pass to her. In her independent-executor capacity, she approached Schultz and Kellar about buying the Stegall Firm; they expressed interest, and the parties began discussing sale terms and how the business would operate moving forward.

The parties agreed on a purchase price of $50,000, plus all proceeds from the planned sale of the firm's Flower Mound office, in exchange for the estate's ownership interest in the Stegall Firm. But according to Priscilla, the firm was actually valued at about $1,000,000 because of her pending closings, book of business, experience, skill, and contacts. She claimed that an accountant advised her that it would save her and the firm significant tax liability if part of the purchase price was paid to her as salary for her continued employment. She thus intended to use an employment agreement to "capture the value of the title business and firm."

During the sale negotiations, the parties discussed an employment agreement to be entered into between Priscilla and the firm. Priscilla claims that in March 2013, everyone agreed to a ten-year employment agreement, with Priscilla being a "silent partner" receiving an annual salary of $150,000 plus a percentage of the monthly title premiums and escrow fees.

In early May 2013, Priscilla hired Dustin Sparks, an attorney with Geary, Porter, and Donovan, P.C., to represent her individually and as executor of Randy's estate in the sale of the Stegall Firm to Schultz and Kellar. Schultz and Kellar retained their own counsel, Phil Ruais.

Sparks and Ruais worked together to prepare the sale documents, and they discussed a possible employment agreement for Priscilla. But as the May 28, 2013 closing date approached,[2] the employment agreement's terms remained in flux, and Priscilla claims that on closing day, the parties agreed to reduce the employment agreement's duration to a five-year term. The sale closed as scheduled, but Priscilla and the firm—now known as Schultz and Kellar, PLLC (the SK Firm)—never signed an employment agreement. Even so, Priscilla continued to work there.

By September 2013, Priscilla was unhappy with the way Schultz and Kellar were running the firm. Worried that she could be fired, Priscilla met with Sparks that month regarding the employment agreement. Sparks advised her that because there was no written employment agreement, she was free to work elsewhere, but Priscilla decided to stay at the SK Firm.

Six months later, in March 2014, the SK Firm fired Priscilla. A little over a year later, Priscilla—in her individual capacity only—sued Schultz, Kellar, and the SK Firm

---

[2]According to the parties, the Stegall Firm's operating agreement required the sale to close within 90 days of Randy's death. The operating agreement is not in the appellate record.

(collectively, the SK Defendants) in Tarrant County District Court for claims arising from her termination and from the sale of the Stegall Firm to Schultz and Kellar.

The SK Defendants' answer included a verified denial challenging Priscilla's ability to recover in her individual capacity and an affirmative defense challenging her standing to sue. The SK Defendants also specially excepted to Priscilla's pleadings, and the district court ordered her to amend her petition to "set forth distinctively the claims and damages [she was] asserting against Defendants in her individual capacity and the claims and damages [she was] asserting against [them] as the Execut[or] of the Estate of Randall Stegall." In response, Priscilla amended her pleadings to assert claims against the SK Defendants also in her capacity as executor of Randy's estate: breach of contract, fraudulent inducement, fraud, negligent misrepresentation, and breach of informal fiduciary duty. Specifically, Priscilla-as-executor alleged that Schultz and Kellar used the promise of an employment agreement to induce her to sell the Stegall Firm to them for less than its fair market value and that the estate was thus injured.

The SK Firm then counterclaimed against Priscilla in her capacity as executor for breach of contract and conversion, claiming that the estate had failed to deliver all the assets that the SK Firm had purchased from the Stegall Firm. In June 2016, the SK Defendants successfully moved to transfer the case to Tarrant County Probate Court Number Two, the court in which Randy's will was probated.

Meanwhile, in March 2016, Priscilla, individually, sued Sparks and the Geary Porter firm (collectively, the GPD Defendants) in Dallas County District Court for legal malpractice in representing her in the sale of the Stegall Firm. In July 2016, Priscilla amended her petition to also sue the GPD Defendants in her estate-executor capacity, claiming that they were also negligent in representing the estate in the sale. Priscilla then successfully moved to transfer the legal-malpractice case from Dallas County District Court to Tarrant County Probate Court Number Two and to consolidate it with the case against the SK Defendants. Soon after, the presiding judge of Tarrant County Probate Court Number Two recused herself on her own motion, and the consolidated case was assigned to Tarrant County Probate Court Number One.

In December 2016, the SK Firm filed an amended pleading abandoning its counterclaims against Priscilla in her capacity as executor. *See* Tex. R. Civ. P. 62, 65. The following month, Priscilla amended her petition for the eighth time. Individually and in her capacity as executor, she alleged (1) a breach-of-contract claim against the SK Defendants; (2) claims against Schultz and Kellar for fraudulent inducement, fraud by nondisclosure, fraud by partial disclosure, negligent misrepresentation, and breach of informal fiduciary duty; and (3) a legal-malpractice claim against the GPD Defendants.

The GPD Defendants and the SK Defendants all moved for summary judgment. The GPD Defendants moved for summary judgment on limitations,

6

arguing that the two-year statute of limitations barred Priscilla's legal-malpractice claim because that claim accrued in either May or September 2013 but Priscilla did not sue until March 2016, well after limitations had run. The SK Defendants moved for summary judgment only on Priscilla's breach-of-contract claim, arguing that there was no valid and enforceable employment agreement because the parties never had a meeting of the minds on its material terms and, alternatively, the alleged agreement was unenforceable under the statute of frauds. The probate court granted both motions without stating the grounds on which it relied for its rulings.

Priscilla then amended her petition for the ninth time to seek a declaration that she rather than the estate owned "all claims, property, assets[,] and anything of value that was formerly owned by Randy Stegall or his Estate" and that "she individually is the proper party to assert any and all claims that could have ever belonged to the estate or Randy Stegall as the sole devisee of his Last Will and Testament."

After that last amendment, Schultz and Kellar moved for summary judgment on Priscilla's remaining claims: fraudulent inducement, fraud by nondisclosure, fraud by partial disclosure, negligent misrepresentation, and breach of informal fiduciary duty. With respect to the fraud-based and negligent-misrepresentation claims, Schultz and Kellar argued that Priscilla unjustifiably relied on their representations. They also argued that no informal fiduciary relationship existed. The trial court granted the motion, found that Priscilla's declaratory-judgment action was thereby moot, and signed a final take-nothing judgment against her.

Priscilla has appealed and raises five issues: (1) the probate court lacked jurisdiction over the case when it transferred the case from district court; (2) even if the probate court had jurisdiction at the time of transfer, it lost jurisdiction when the SK Firm nonsuited its claims against the estate; (3) the trial court erred by granting the GPD Defendants' summary-judgment motion on their limitations defense; (4) the trial court erred by granting summary judgment for the SK Defendants on Priscilla's breach-of-contract claim; and (5) the trial court erred by granting summary judgment for Schultz and Kellar on Priscilla's remaining tort claims.

## II.
## Appellate Jurisdiction

Before we address Priscilla's appellate complaints, we must consider our jurisdiction. The GPD Defendants have moved to dismiss this appeal, arguing that we lack jurisdiction because Priscilla's notice of appeal was untimely filed. The GPD Defendants contend that Priscilla's appellate deadline ran from August 16, 2017—the date the trial court signed an order granting Schultz and Kellar summary judgment on Priscilla's last remaining claims—because that order was a final judgment. Priscilla responds that her deadlines started to run from August 29, 2017—the date the trial court signed its final judgment—because that judgment modified the August 16 order. *See* Tex. R. Civ. P. 329b(h).

In its August 16, 2017 "Order Granting Defendant's Motion for Partial Summary Judgment on All Remaining Claims," the trial court recited that it had

reviewed "all timely filed pleadings, the Motion, Plaintiff's Response, and the evidence and arguments of counsel" and dismissed with prejudice the "remaining causes of action for fraudulent inducement, fraud by nondisclosure and partial disclosure, negligent misrepresentation[,] and breach of informal fiduciary duty." The order stated that "[t]his is a final judgment and disposes of all parties and all claims and is appealable." *See In re Elizondo*, 544 S.W.3d 824, 827–28 (Tex. 2018) (orig. proceeding) (concluding that an order or judgment not following a trial on the merits is final if it disposes of all pending claims and parties or if it clearly and unequivocally states that it does).

On August 29, 2017, the trial court signed a "Final Judgment." In this order, the trial court recited that it had granted the SK Defendants' two summary-judgment motions. The trial court also found that Priscilla's only remaining claim, for a declaratory-judgment, was moot because the trial court had dismissed her other claims with prejudice. The trial court ordered a take-nothing judgment, and the judgment closed by stating that "[t]his JUDGMENT is final, disposes of all claims and parties, and is appealable" and by ordering execution to issue.

A trial court retains plenary power to vacate, modify, correct, or reform its judgment for 30 days after it signs the judgment. Tex. R. Civ. P. 329b(d). If the trial court modifies, corrects, or reforms the judgment "in any respect" during that time, "the time for appeal shall run from the time the modified, corrected, or reformed judgment is signed." Tex. R. Civ. P. 329b(h). "[A]ny change, whether or not material

9

or substantial, made in a judgment while the trial court retains plenary power, operates to delay the commencement of the appellate timetable until the date the modified, corrected or reformed judgment is signed." *Check v. Mitchell*, 758 S.W.2d 755, 756 (Tex. 1988); *see Arkoma Basin Expl. Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 391 (Tex. 2008) ("Thus, appellate deadlines are restarted by an order that does nothing more than change the docket number or deny all relief not expressly granted."); *Lane Bank Equip. Co. v. Smith S. Equip., Inc.*, 10 S.W.3d 308, 313 (Tex. 2000) ("[A]ny change made by the court under subpart (h) prior to losing jurisdiction, even a clerical change, will restart the appellate timetable.").

The trial court's August 29 judgment—signed during the trial court's plenary power—modified the August 16 judgment by expressly finding Priscilla's declaratory-judgment claim moot and dismissing it with prejudice, as well as by expressly entering a take-nothing judgment and ordering execution to issue. *See* Tex. R. Civ. P. 329b(d). The August 29 judgment thus restarted the appellate timetable.[3] *See* Tex. R. Civ. P. 329b(h); *see also* Tex. R. App. P. 4.3(a); *Arkoma Basin Expl.*, 249 S.W.3d at 391; *Lane Bank Equip.*, 10 S.W.3d at 313; *Check*, 758 S.W.2d at 756. On September 27, 2017, Priscilla timely moved for a new trial, *see* Tex. R. Civ. P. 329b(a), thereby extending

---

[3]The only time Rule 329b(h) does not operate to reset the appellate timetable is in a case "in which the face of the record reveals that the trial court entered the new order *for the sole purpose* of extending the appellate timetable." *Mackie v. McKenzie*, 890 S.W.2d 807, 808 (Tex. 1994) (emphasis added). From the face of this record, that does not appear to be the case. *See id.*

10

her deadline to file her notice of appeal to November 27, 2017, *see* Tex. R. App. P. 26.1(a)(1). Priscilla timely filed her notice of appeal on November 13, 2017. *See id.*

Because Priscilla timely filed her notice of appeal, we hold that we have jurisdiction over this appeal. *See id.* We therefore deny the GPD Defendants' dismissal motion.

## III.
## The Probate Court's Jurisdiction

In her first and second issues, Priscilla argues that the probate court lacked subject-matter jurisdiction when it transferred the SK Defendants' case from district court to itself and that even if the probate court had jurisdiction at the time of transfer, it lost jurisdiction when the SK Firm nonsuited its breach-of-contract and conversion claims against the estate.

### A. The probate court's transfer power

In parts of her first two issues, Priscilla challenges the probate court's transferring her suit against the SK Defendants to itself.[4]

### 1. Applicable law

The SK Defendants moved to transfer venue from Tarrant County District Court to Tarrant County Probate Court Number Two in accordance with Estates

---

[4]On Priscilla's motion, the probate court transferred her suit against the GPD Defendants from Dallas County District Court to itself. Because she makes no argument regarding whether venue was proper in the probate court as to those claims, we do not address the issue.

11

Code Section 34.001. *See* Tex. Est. Code. Ann. § 34.001. A transfer under this section is "essentially a specialized form of venue transfer for matters relating to a probate proceeding pending in a probate court." *In re Estate of Aguilar*, 435 S.W.3d 831, 833 (Tex. App.—San Antonio 2014, no pet.); *see Gonzalez v. Reliant Energy, Inc.*, 159 S.W.3d 615, 622 (Tex. 2005) ("The transfer of a case [under former Probate Code Section 5B[5]] pertains to venue, not jurisdiction."). Section 34.001 provides that a statutory probate court[6] may transfer to itself from a district court (1) "a cause of action related to a probate proceeding pending in the statutory probate court" or (2) "a cause of action in which a personal representative of an estate pending in the statutory probate court is a party."[7] Tex. Est. Code. Ann. § 34.001(a). Priscilla contends that the probate court improperly transferred the case under Section 34.001 because Randy's estate was closed at the time the SK Defendants moved to transfer the case, and thus there was neither a probate proceeding nor an estate

---

[5]The legislature redesignated former Probate Code Section 5B as Estates Code Section 34.001. *See* Act of May 2, 2013, 83rd Leg., R.S., ch. 161, § 6.009, sec. 5B, 2013 Tex. Gen. Laws 623, 635–36 (current version at Tex. Est. Code Ann. § 34.001).

[6]Tarrant County's two probate courts are statutory probate courts. Tex. Gov't Code Ann. § 25.2221(c) (stating that Tarrant County's two probate courts are statutory probate courts); *see* Tex. Est. Code Ann. § 22.007(c) (stating that a "statutory probate court" is a court created by statute and designated as a statutory probate court under Government Code Chapter 25).

[7]Section 34.001(a) also permits a statutory probate court to "consolidate the transferred cause of action with the other proceedings in the statutory probate court relating to that estate." Tex. Est. Code. Ann. § 34.001(a).

pending in the probate court. *See In re John G. Kenedy Mem'l Found.*, 159 S.W.3d 133, 144 (Tex. App.—Corpus Christi–Edinburg 2004, orig. proceeding) (determining that "[t]he word 'pending' does not describe a closed estate" and concluding that an estate must be pending to trigger a probate court's transfer power under former Probate Code Section 5B).

### 2. Analysis

A probate court's jurisdiction attaches at the time the application for the probate of a will is filed. *In re Blankenship*, 392 S.W.3d 249, 257 (Tex. App.—San Antonio 2012, no pet.). Once the probate court's jurisdiction attaches, it continues until the estate is closed. *Id.*

As noted, Priscilla filed an application to probate Randy's will and was appointed independent executor of his estate, which succeeded Randy as the Stegall Firm's sole member upon his death. Because Priscilla is not an attorney, she could not own an interest in or share in the profits from the Stegall Firm. *See generally* Tex. Disciplinary Rules Prof'l Conduct R. 5.04, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G, app. A (Tex. State Bar R. art. X, § 9). Randy's will allowed Priscilla, as executor, to sell estate property for the purpose of administering the estate.[8] *See generally* Tex. Est. Code Ann. §§ 356.002 ("Power of Sale Authorized by Will"),

---

[8]As a practical matter, it appears that Priscilla, as a nonlawyer, had to sell the firm during the estate administration in order to distribute the value of Randy's ownership interest in the firm to herself as sole beneficiary of Randy's estate.

13

402.052 ("Sale of Estate Property Generally"). As part of her administration of the estate, Priscilla, as executor, sold the firm to Schultz and Kellar.[9] *Cf.* Tex. Disciplinary Rules Prof'l Conduct R. 5.04(d) ("A lawyer shall not practice with or in the form of a professional corporation or association authorized to practice law for a profit if . . . a nonlawyer owns any interest therein, except that a fiduciary representative of the estate of a lawyer may hold stock or interest of the lawyer for a reasonable time during administration[.]"). Priscilla's claims against the SK Defendants and the GPD Defendants arise from her sale (in her capacity as the estate's executor) of the Stegall Firm to Schultz and Kellar.

"Traditionally, independent estate administrations have not been formally closed in Texas." 2 Thomas M. Featherstone, Jr., et al., *Texas Practice Guide Probate* § 13:1 (2018–19 ed.), Westlaw (database updated Nov. 2018). The Estates Code, however, allows an independent executor to formally close an estate by filing a closing report or a notice to close the estate after

> [a]ll of the debts known to exist against the estate have been paid, or when they have been paid so far as the assets in the independent executor's possession will permit, when there is no pending litigation, and when the independent executor has distributed to the distributees

---

[9]To effect the Stegall Firm's ownership transfer to Schultz and Kellar, Priscilla signed an "Assignment and Redemption of Membership Interest" and a "First Amendment to the Company Agreement of the The Stegall Firm, PLLC" in her capacity as executor. The sale was seller-financed, and the Stegall Firm (as owned by Schultz and Kellar) executed a secured purchase-price promissory note and a secured revolving-line-of-credit note payable to Randy's estate.

entitled to the estate all assets of the estate, if any, remaining after payment of debts . . . .

Tex. Est. Code Ann. § 405.004. But an independent executor is not required to close the administration by filing a report or notice. *See id.* § 405.012. In the absence of a formal estate closing, an independent administration is considered closed when all debts and claims against the estate have been paid, the estate's assets have been distributed, and there is no need for further administration. *See Blankenship*, 392 S.W.3d at 257–58; *In re Estate of Rowan*, No. 05-06-00681-CV, 2007 WL 1634054, at *3 (Tex. App.—Dallas June 7, 2007, no pet.) (mem. op.); *Tex. Commerce Bank–Rio Grande Valley, N.A. v. Correa*, 28 S.W.3d 723, 729 (Tex. App.—Corpus Christi–Edinburg 2000, no pet.).

Here, Priscilla never formally closed the estate, although while the SK Defendants' venue-transfer motion was pending, she filed a notice to close the estate pursuant to Estates Code Section 405.006. *See* Tex. Est. Code Ann. § 405.006. But that notice was ineffective, for a simple, statutory reason: there was litigation pending. *See id.* § 405.004 (stating that an independent executor may file a notice to close the estate "when there is no pending litigation"); *In re Estate of Bean*, 206 S.W.3d 749, 759 (Tex. App.—Texarkana 2006, pet. denied) (holding that independent executor could not formally close an administration by affidavit while litigation was pending).

Priscilla also did not establish that the estate was otherwise closed. In the notice to close the estate—filed after the SK Defendants moved to transfer venue—Priscilla

(as executor) stated that all debts known to exist against the estate had been paid, or had been paid to the extent permitted by the assets in her possession, and that all remaining estate assets had been distributed to her as the sole beneficiary of Randy's estate. Even so, further estate administration was needed because estate-related issues remained unresolved: (1) the claims arising from and during Priscilla's administration of the estate, and (2) whether Priscilla individually or Priscilla as executor had standing and capacity to assert those claims. Accordingly, Randy's estate was open and thus still pending, which triggered the probate court's power under Section 34.001 to transfer the case to itself from district court.[10] *See* Tex. Est. Code Ann. § 34.001(a); *John G. Kenedy Mem'l Found.*, 159 S.W.3d at 144.

Because Priscilla's and the SK Defendants' suit involved a "cause of action in which a personal representative of an estate pending in the statutory probate court is a party,"[11] the probate court's transfer was proper.[12] *See* Tex. Est. Code Ann.

---

[10]Relying on *Pugh v. Turner*, 197 S.W.2d 822, 826 (Tex. 1946), Priscilla also asserts that her husband's estate closed as a matter of law one year after the probate court approved the inventory, appraisement, and list of claims in mid-October 2013. But the holding in *Pugh* "of a presumption that administration terminated at the expiration of one year is inapplicable" because of the adoption of the Probate Code (the Estates Code's predecessor). *Ford v. Roberts*, 478 S.W.2d 129, 132 (Tex. App.—Dallas 1972, writ ref'd n.r.e.).

[11]When the SK Defendants moved to transfer venue to probate court, Priscilla's live pleading included claims in her capacity as executor. By the time the probate court heard the venue-transfer motion, Priscilla had amended her petition again, this time to assert claims in her individual capacity only and ostensibly in an attempt to avoid transfer to the probate court. But at that time, the SK Firm's counterclaims against Priscilla in her capacity as executor remained pending, even

16

§ 34.001(a); *see also id.* §§ 22.017 (defining "independent executor" to mean "the personal representative of an estate"), 22.031 (defining "representative" and "personal representative" to include independent executors).

## B. The probate court's subject-matter jurisdiction

In the remaining parts of her first and second issues, Priscilla argues that the probate court lacked subject-matter jurisdiction over the case and that the probate court's orders and final judgment are thus void.

### 1. *Standard of review and law regarding jurisdiction*

Whether a trial court has subject-matter jurisdiction is a legal question that we review de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004) (op. on reh'g); *Tex. Nat. Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 855 (Tex. 2002). Subject-matter jurisdiction is "essential to a court's power to decide a case." *City of Houston v. Rhule*, 417 S.W.3d 440, 442 (Tex. 2013) (quoting *Bland I.S.D. v. Blue*, 34 S.W.3d 547, 553–54 (Tex. 2000)). Subject-matter jurisdiction is never presumed; it cannot be waived or conferred by consent. *See Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 75–76 (Tex. 2000).

---

though the SK Firm would later abandon them. Some two months after the transfer, Priscilla amended her petition against the SK Defendants to reassert claims in her capacity as executor.

[12]On Priscilla's motion, the probate court consolidated her case against the SK Defendants with her case against the GPD Defendants. *See* Tex. Est. Code Ann. § 34.001(a) (permitting a statutory probate court to "consolidate the transferred cause of action with the other proceedings in the statutory probate court relating to that estate").

"Without jurisdiction the court cannot proceed at all in any cause; it may not assume jurisdiction for the purpose of deciding the merits of the case." *Fin. Comm'n of Tex. v. Norwood*, 418 S.W.3d 566, 578 (Tex. 2013) (op. on reh'g) (quoting *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 431, 127 S. Ct. 1184, 1191 (2007)). A judgment is void if it was rendered by a court without subject-matter jurisdiction. *In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 309 (Tex. 2010) (orig. proceeding). "[W]hen one court has . . . exclusive jurisdiction over a matter, any order or judgment issued by another court pertaining to the same matter is void." *In re CC & M Garza Ranches Ltd. P'ship*, 409 S.W.3d 106, 109 (Tex. App.—Houston [1st Dist.] 2013, orig. proceeding) (quoting *Celestine v. Dep't of Family & Protective Servs.*, 321 S.W.3d 222, 230 (Tex. App.—Houston [1st Dist.] 2010, no pet.)).

## 2. *The statutory probate court's jurisdiction*

"Probate courts are courts of limited jurisdiction." *Stauffer v. Nicholson*, 438 S.W.3d 205, 213 (Tex. App.—Dallas 2014, no pet.). All probate proceedings must be filed and heard in a court exercising original probate jurisdiction, and a court exercising such jurisdiction also has jurisdiction over all matters related to the probate proceeding as specified in Section 31.002 for that type of court. Tex. Est. Code Ann. § 32.001(a); *see id.* § 31.002 (listing types of matters related to probate proceedings, which vary depending on whether the county has a statutory probate court, a county court at law exercising probate jurisdiction, or neither). In a county like Tarrant that has a statutory probate court, that court has original jurisdiction over probate

proceedings. *Id.* § 32.002(c). Moreover, a statutory probate court has exclusive jurisdiction over "all probate proceedings, regardless of whether contested or uncontested." *Id.* § 32.005(a). And any cause of action related to the probate proceeding must be brought in a statutory probate court unless that court's jurisdiction is concurrent with a district court's jurisdiction as provided by Section 32.007 or with the jurisdiction of any other court.[13] *Id.*

A "probate proceeding" includes "a matter or proceeding relating to a decedent's estate;" "the probate of a will, with or without administration of the estate;" and "an application, petition, motion, or action regarding the probate of a will

---

[13]A statutory probate court has concurrent jurisdiction with the district court in:

(1) a personal injury, survival, or wrongful death action by or against a person in the person's capacity as a personal representative;

(2) an action by or against a trustee;

(3) an action involving an inter vivos trust, testamentary trust, or charitable trust, including a charitable trust as defined by Section 123.001, Property Code;

(4) an action involving a personal representative of an estate in which each other party aligned with the personal representative is not an interested person in that estate;

(5) an action against an agent or former agent under a power of attorney arising out of the agent's performance of the duties of an agent; and

(6) an action to determine the validity of a power of attorney or to determine an agent's rights, powers, or duties under a power of attorney.

*Id.* § 32.007.

19

or an estate administration." *Id.* §§ 22.029, 31.001(1), (4); *see id.* § 22.012 (defining "estate"). A "matter related to a probate proceeding" includes, among other things, "any cause of action in which a personal representative of an estate pending in the statutory probate court is a party in the representative's capacity as personal representative." *Id.* § 31.002(c)(2).

### 3. Analysis

Here, the probate court had original jurisdiction over the administration of Randy's estate, *see id.* § 32.002(c), and thus had jurisdiction over "all matters related to the probate proceeding." *Id.* § 32.001(a). And as we determined above, Randy's estate was open and pending at the time the probate court transferred the SK Defendants' case from district court to itself. A pending probate proceeding triggers a statutory probate court's exclusive subject-matter jurisdiction over any "cause of action related to the probate proceeding" under Section 32.005. *See Baker v. Baker*, No. 02-18-00051-CV, 2018 WL 4224843, at *1 (Tex. App.—Fort Worth Sept. 6, 2018, no pet.) (mem. op.).

As noted, matters related to probate proceedings include "any cause of action in which a personal representative of an estate pending in the statutory probate court is a party in the representative's capacity as personal representative." Tex. Est. Code Ann. § 31.002(c)(2). Because Priscilla is a party to the suits against the SK Defendants and the GPD Defendants in her capacity as executor, those suits are "related to a probate proceeding." *Id.* The SK Firm's abandonment of its counterclaims against the

20

estate after the transfer to probate court did not affect the probate court's jurisdiction. We therefore hold that the probate court had subject-matter jurisdiction over the case and its orders and final judgment are not void.[14] *See id.* §§ 32.001(a), .005(a).

We overrule Priscilla's first and second issues.

## IV.
### Amended Pleadings and Waiver

Before we address Priscilla's issues challenging the probate court's summary-judgment rulings, we must determine whether she waived error by filing amended pleadings abandoning some of her claims after the probate court granted summary judgment against her on those claims. The SK Defendants and the GPD Defendants both point out that after the trial court granted summary judgment on Priscilla's claims for legal malpractice and breach of contract, she amended her pleadings to remove those claims. They argue that by doing so, she has waived any putative error regarding the trial court's granting summary judgment on these claims. *See Kinney v. Palmer*, No. 04-07-00091-CV, 2008 WL 2515696, at *3 (Tex. App.—San Antonio June 25, 2008, no pet.) (mem. op.) ("[B]y amending their pleading and eliminating the DTPA, negligent misrepresentation, and fraud references, the Kinneys abandoned those claims and have waived any error concerning the trial court's action in granting

---

[14]When a district court and probate court have concurrent subject-matter jurisdiction over a cause of action "the issue is one of dominant jurisdiction." *See In re Puig*, 351 S.W.3d 301, 305 (Tex. 2011) (orig. proceeding). Priscilla made no argument in the trial court nor does she argue on appeal that the district court had dominant jurisdiction. Thus, we do not address the issue.

21

Palmer's motion for partial summary judgment as to these claims."); *see also* Tex. R. Civ. P. 65.

As a general rule, filing an amended petition that does not include a particular cause of action effectively nonsuits or voluntarily dismisses the omitted claim when the pleading is filed, and no hearing is necessary to effect the nonsuit. *FKM P'ship, Ltd. v. Bd. of Regents of Univ. of Houston Sys.*, 255 S.W.3d 619, 632 (Tex. 2008). Abandoning a cause of action in an amended pleading waives any error by the trial court regarding the abandoned cause of action. *Lopez v. Crest Gateway, LP*, No. 02-17-00429-CV, 2018 WL 5832124, at *2 (Tex. App.—Fort Worth Nov. 8, 2018, no pet.) (mem. op.).

But the supreme court has recognized "possible circumstances" that create an exception to this general rule: statements in the amended pleading indicating that the pleader intended to reserve her rights with respect to the omitted claims. *See FKM P'Ship*, 255 S.W.3d at 633 (citing *Ortiz v. Collins*, 203 S.W.3d 414, 421 n.4 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (reasoning that plaintiff who stated in his amended pleading that he did not waive and expressly reserved "his right to pursue or re-assert either in [the trial] court and/or on appeal" the causes of action previously dismissed by the trial court and not pleaded in the amended pleading did not abandon his previous claims)). If the pleading expressly indicates no intent to waive any rights associated with omitted causes of action, the pleader has not waived error regarding those claims. *See Spellmann v. Love*, 534 S.W.3d 685, 691 (Tex. App.—Corpus Christi–Edinburg 2017, pet. denied).

Here, in her amended pleading omitting her breach-of-contract and legal-malpractice claims, Priscilla stated, "Claims and parties have been removed from this pleading based on dismissal orders signed by the Court so that the live pleading will reflect the current parties and issues and for no other purpose. No claims or rights that might exist are being wa[i]ved." We conclude that this language clearly demonstrated Priscilla's intent to not abandon her claims for breach of contract and legal malpractice. *See Ortiz*, 203 S.W.3d at 421 n.4. Accordingly, we hold that she has not waived any alleged error by the trial court regarding these causes of action, and we can thus reach the merits of the trial court's summary-judgment rulings. *See Spellman*, 534 S.W.3d at 691 (citing *Ortiz*, 203 S.W.3d at 421 n.4).

## V.
## Summary Judgment in Favor of the GPD Defendants and the SK Defendants on Their Affirmative Defenses

In her third issue, Priscilla complains that the trial court erred by granting summary judgment in favor of the GPD Defendants on their limitations affirmative defense. In part of her fourth issue, she argues that the trial court erred by granting summary judgment in favor of the SK Defendants on their statute-of-frauds defense to her breach-of-contract claim.

### A. Standard of review

Limitations and statute of frauds are affirmative defenses. Tex. R. Civ. P. 94. A defendant is entitled to summary judgment on an affirmative defense by conclusively proving all elements of that defense. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494,

23

508–09 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c). To accomplish this, the defendant must present summary-judgment evidence that conclusively establishes each element of the affirmative defense. *See Chau v. Riddle*, 254 S.W.3d 453, 455 (Tex. 2008).

We review a summary judgment de novo. *Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).

## B. Limitations (GPD Defendants)

Priscilla sued the GPD Defendants for legal malpractice, claiming that they were negligent in their legal representation of her individually and as estate executor in the sale of the Stegall Firm to Schultz and Kellar because the GPD Defendants failed to ensure that she had a written employment agreement and failed to advise her on the ramifications of not having such an agreement. Priscilla contended that the GPD Defendants' negligence resulted in "the loss of a majority of the value in the [f]irm and business being sold" and the loss of the value of the employment agreement. The GPD Defendants moved for summary judgment on limitations.

Legal-malpractice claims are governed by a two-year statute of limitations. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a); *Willis v. Maverick*, 760 S.W.2d 642,

24

644 (Tex. 1988). Limitations begin to run when the claim accrues, *see* Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a), and a claim "accrues" when the claimant sustains a legal injury or, in cases governed by the discovery rule, when the claimant discovers or should have discovered the facts establishing the elements of a cause of action. *See Hughes v. Mahaney & Higgins*, 821 S.W.2d 154, 156 (Tex. 1991).

The point at which a cause of action accrues is a legal question. *Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 623 (Tex. 2011). A cause of action accrues "when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred." *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996). "A person suffers legal injury from faulty professional advice when the advice is taken." *Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex. 1997). But in legal-malpractice claims, the discovery rule defers the accrual of a claim until the client knows, or should have known through reasonable care and diligence, the facts establishing the elements of her cause of action. *See Willis*, 760 S.W.2d at 646. The client need not know the specific nature of each wrongful act that may have caused the injury for her claim to accrue under the discovery rule. *See KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp.*, 988 S.W.2d 746, 749 (Tex. 1999). Nor does the client need to know the full extent of her damages before limitations begin to run. *See Murphy*, 964 S.W.2d at 273. Rather, a cause of action accrues under the discovery rule when the client discovers or, in the exercise of reasonable diligence, should discover the "nature of [her] injury." *Childs v. Haussecker*, 974 S.W.2d 31, 40 (Tex.

1998). "[D]iscovering the 'nature of the injury' requires knowledge of the wrongful act and the resulting injury." *Id.* Thus, the discovery rule defers accrual of a claim only until the client discovers, or should have discovered through reasonable diligence, the injury and that it was likely caused by the wrongful acts of another. *See id.*

Here, the GPD Defendants argued in their summary-judgment motion that limitations barred Priscilla's legal-malpractice claim because that claim accrued in either late May 2013 (when the Stegall Firm was sold to Schultz and Kellar without Priscilla's having an employment agreement) or, at the very latest, September 2013 (when Sparks and Priscilla met to discuss her not having an employment agreement), but she did not sue the GPD Defendants until March 14, 2016, well after the two-year limitations period had expired. Priscilla countered that her claim did not accrue under either the legal-injury rule or the discovery rule until she was fired on March 21, 2014, because only then did she suffer any financial injury.

Financial injury, however, is not necessarily the same as legal injury, and any legal injury that Priscilla incurred (in any capacity) as a result of the GPD Defendants' alleged legal malpractice occurred at the end of May 2013 when she sold the Stegall Firm without the benefit of a written employment agreement. *See Belt v. Oppenheimer, Blend, Harrison & Tate, Inc.*, 192 S.W.3d 780, 785–86 (Tex. 2006) (concluding that legal-malpractice claim involving estate planning accrued when estate-planning attorney negligently drafted will, not when the estate suffered the negative consequences of that act); *Murphy*, 964 S.W.2d at 270 ("A person suffers legal injury

26

from faulty professional advice when the advice is taken."). But because the discovery rule applies to legal-practice cases and Priscilla raised it, the SK Defendants had the burden to prove that Priscilla knew or should have known the facts establishing her legal-malpractice claim more than two years before she sued the SK Defendants on March 14, 2016. *See KPMG Peat Marwick*, 988 S.W.2d at 748 (holding a defendant moving for summary judgment on limitations must negate the discovery rule "if it applies and has been pleaded or otherwise raised").

According to Priscilla's summary-judgment evidence, she explained to Sparks that an employment agreement that would guarantee her employment for a specified term of years and give her some level of management control was an essential part of the sale, and she and Sparks had numerous discussions about the employment agreement and its terms leading up to the sale of the Stegall Firm in late May 2013. Priscilla knew that she did not have a written employment agreement when the sale closed. After the sale, Sparks drafted an employment agreement and sent it to Priscilla for review and approval. But the employment agreement was never finalized or executed.

The GPD Defendants argued that, at the latest, Priscilla knew or should have known the facts establishing her legal-malpractice claim at her meeting with Sparks on September 9, 2013. During that meeting, Priscilla "vented" to Sparks about Schultz and Kellar's management decisions and the changes they had made to the firm. Sparks told her that because she did not have an employment agreement, she could leave the

27

firm and seek employment elsewhere. At the time of that meeting, Priscilla knew she could be fired. She instructed Sparks not to send the draft employment agreement to Schultz and Kellar because she "did not believe they would sign it" and because "it contained terms that were never discussed or agreed to that [she] also did not want to sign." Priscilla realized that "[t]here was no point in having [Sparks] try to negotiate a term employment agreement . . . as [she] had no leverage at that point to not sell them the Firm." Because she "had greatly reduced leverage in the transaction," Priscilla understood in September 2013 that "there was no way that [she] could go back and get the shared management that [she] had discussed with Schultz and Kellar into a written agreement."

By the September 2013 meeting, then, Priscilla knew the nature of her injury. But Priscilla claims that she did not know she had a claim for legal malpractice until suffering financial loss when she was fired in March 2014. Under the discovery rule, however, "[o]nce a claimant learns of a wrongful injury, the statute of limitations begins to run even if the claimant does not yet know 'the specific cause of the injury; the party responsible for it; the full extent of it; or the chances of avoiding it.'" *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 207 (Tex. 2011) (op. on reh'g) (quoting *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 93–94 (Tex. 2004)). In discovery-rule cases, "a cause of action accrues when the plaintiff knows or reasonably should know that he has been legally injured by the alleged wrong, *however slightly*." *Murphy*, 964 S.W.2d at 273 (emphasis added). "The fact that

28

the plaintiff's actual damages may not be fully known until much later does not affect the determination of the accrual date for alleged . . . legal malpractice." *Id.*

Here, construing the summary-judgment evidence in Priscilla's favor, we conclude that the GPD Defendants conclusively established that by September 2013 (at the latest) Priscilla knew the facts establishing the elements of her legal-malpractice claim. Because she did not sue the GPD Defendants until over two years later, her legal-malpractice claim was barred by limitations. We therefore overrule Priscilla's third issue.

## C. Statute of frauds (SK Defendants)

Priscilla claimed that as part of the sale to Schultz and Kellar in late May 2013, they agreed that the SK Firm would employ her for five years. Priscilla further claimed that the SK Defendants breached this agreement when they fired her in March 2014. As noted, the SK Defendants moved for summary judgment on Priscilla's breach-of-contract claim, arguing that the alleged agreement to employ Priscilla for five years was unenforceable because it was subject to the statute of frauds and was not in writing or signed by the parties. Priscilla countered that the employment agreement was enforceable despite the statute of frauds because she partially performed.

The statute of frauds is an affirmative defense to breach of contract. *See* Tex. Bus. & Com. Code Ann. § 26.01(a); Tex. R. Civ. P. 94; *Duradril, L.L.C. v. Dynomax Drilling Tools, Inc.*, 516 S.W.3d 147, 158 (Tex. App.—Houston [14th Dist.] 2017, no pet.). A contract that cannot be performed within one year of its making falls within

29

the statute of frauds. *See* Tex. Bus. & Com. Code Ann. § 26.01(b)(6). Such a contract is enforceable against a party only if it is in writing and is signed by that party. *See id.* § 26.01(a). Thus, an agreement for employment for more than one year comes within the statute of frauds and must be in writing and signed by the defendant to be enforceable. *See Timmons v. Scarbrough, Medlin & Assocs., Inc.*, No. 05-05-00235-CV, 2005 WL 3436706, at *1 (Tex. App.—Dallas Dec. 15, 2005, no pet.) (mem. op.); *C.S.C.S. v. Carter*, 129 S.W.3d 584, 590 (Tex. App.—Dallas 2003, no pet.).

As the party pleading the statute of frauds, the SK Defendants bore the initial burden of establishing the defense's applicability. *See Dynegy, Inc. v. Yates*, 422 S.W.3d 638, 641 (Tex. 2013). Because the SK Defendants met their burden[15]—which Priscilla does not dispute—the burden shifted to her to establish an exception taking the oral employment agreement out of the statute of frauds. *See id.* In this regard, Priscilla argues that "Texas law requires [the contract's] enforcement in equity" because she "performed her obligations under the agreement."

Partial performance is indeed an exception to the statute of frauds. *See Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 439 (Tex. App.—Dallas 2002, pets. denied). Under this exception, a contract that has been partially performed but that does not

---

[15]Whether a contract comes within the statute of frauds is a legal question that we review de novo. *Dynegy*, 422 S.W.3d at 642. Here, the alleged five-year employment agreement is subject to the statute of frauds and is thus unenforceable because it is not in writing and signed by the SK Defendants. *See* Tex. Bus. & Com. Code Ann. § 26.01(a), (b)(6).

satisfy the statute of frauds may be enforced in equity if denial of enforcement would amount to virtual fraud. *Id.* The partial performance must be "unequivocally referable" to the agreement and corroborative of the fact that a contract actually was made. *Id.* That is, the acts "must be such as could have been done with no other design than to fulfill the particular agreement sought to be enforced; otherwise they do not tend to prove the existence of the parol agreement relied upon by the plaintiff." *Id.* at 439–40. "If the evidence establishes that the party who performed the act that is alleged to be partial performance could have done so for some reason other than to fulfill obligations under the oral contract, the exception is unavailable." *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 426–27 (Tex. 2015).

Priscilla contends that she partially performed the employment agreement in several ways: by training Schultz and Kellar in the title business, by closing deals, by connecting them with referral sources and contacts, and by acting in the role of branch manager and silent partner. This claimed "partial performance" consisted of her rendering services to the firm—services for which Priscilla was indisputably compensated during the ten months she was employed there after the sale to Schultz and Kellar. "[A] salary compensates for services rendered; if a person received payment for his services, those services will not act as an exception to the statute of frauds." *Holloway v. Dekkers*, 380 S.W.3d 315, 324 (Tex. App.—Dallas 2012, no pet.); *see Timmons*, 2005 WL 3436706, at *2 ("Rendition of services for which a person receives a monthly salary is insufficient to take an agreement outside of the statute of

frauds because the rendition of services is fully explained by the salary."). Accordingly, the services Priscilla provided and was paid for do not overcome the statute-of-frauds defense.

Priscilla also contends that she partially performed the employment agreement by signing over the company and by funding the firm's operating costs. But Priscilla does not contend—nor is there any evidence—that these actions were "unequivocally referable" to the employment agreement. That is, there is no evidence that Priscilla took these actions "with no other design than to fulfill" the employment agreement. *Exxon*, 82 S.W.3d at 439–40.

Because Priscilla failed to prove the partial-performance exception to the statute of frauds, the trial court properly granted summary judgment on her breach-of-contract claim based on the SK Defendants' statute-of-frauds defense.[16] We thus overrule her fourth issue.

---

[16]As noted, the trial court's order granting summary judgment for the SK Defendants did not specify the grounds for its ruling. The SK Defendants also moved for summary judgment on Priscilla's breach-of-contract claim on the ground that the employment agreement was unenforceable because the parties never had a meeting of the minds regarding its material terms. But we do not address this ground because we have concluded that the trial court properly granted summary judgment based on the SK Defendants' statute-of-frauds defense. *See Provident Life & Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003) (stating that if the "trial court's order does not specify the grounds for its summary judgment, [an appellate court] must affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious"); *see also* Tex. R. App. P. 47.1.

## VI.
## Summary Judgment in Favor of the SK Defendants
## on Priscilla's Remaining Claims

In her fifth issue, Priscilla argues that the trial court erred by granting summary judgment in favor of Schultz and Kellar on her claims for fraudulent inducement, fraud by nondisclosure, fraud by partial disclosure, and negligent misrepresentation.[17]

### A. Standard of review

We have already set out the standard of review for a summary judgment. Here we add only the reminder that a defendant that conclusively negates at least one essential element of a plaintiff's cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank*, 315 S.W.3d at 508; *see* Tex. R. Civ. P. 166a(b), (c).

### B. Priscilla's claims for fraudulent inducement, fraud, and negligent misrepresentation

According to Priscilla's pleadings, "[t]he parties all agreed and it was anticipated that after Schultz and Kellar were owners, a written employment agreement would be

---

[17]Although Priscilla's fifth issue generally challenges the granting of summary judgment on "all [her] remaining claims" against Schultz and Kellar, she has not presented any argument within that issue challenging the propriety of the summary judgment on her breach-of-fiduciary-duty claim. As a result, we will not address the propriety of the summary judgment on this claim. *See Shellnut v. Wells Fargo Bank, N.A.*, No. 02-15-00204-CV, 2017 WL 1538166, at *3 (Tex. App.—Fort Worth Apr. 27, 2017, pet. denied) (mem. op.); *see also LeBlanc v. Riley*, No. 02-08-00234-CV, 2009 WL 885953, at *3 (Tex. App.—Fort Worth Apr. 2, 2009, no pet.) (mem. op.) (noting that although a general issue challenging summary judgment is permissible, "to preserve error on a particular cause of action on which the trial court granted summary judgment, an appellant must still present argument and legal authority related to that particular claim").

entered into reflecting the estimated value [she] had placed on the Stegall Firm with her continued involvement totaling at least $750,000.00 to be paid to [her] over five years through guaranteed wages plus bonuses."[18] Even though the parties never executed a written agreement, Schultz and Kellar continued to pay her the agreed-upon amounts until they fired her.

In support of her fraudulent-inducement claim, Priscilla alleged that, "in conjunction with" the sale of the Stegall Firm, Schultz and Kellar falsely represented to her that they would employ her for five years at a certain salary, plus pay her a percentage of the monthly title premiums and escrow fees. Priscilla further claimed that Schultz and Kellar intended for her, individually and as executor, to rely on those representations and that those representations induced her, as executor, to sell the firm to them "with very favorable terms regarding owner financing" and a reduced purchase price. Priscilla claimed that she, individually and as executor, relied on these representations regarding the employment agreement when she sold the firm to Schultz and Kellar.

Similar to her claim for fraudulent inducement related to her sale of the firm, Priscilla's claims for fraud and negligent misrepresentation relate to the representations Schultz and Kellar made during the sale negotiations. In support of

---

[18]Specifically, Priscilla claims that the $50,000 purchase price was well-below the firm's fair market value, which she estimates was about $1,000,000, and that the $750,000 in salary and bonuses she expected to receive under the five-year employment agreement was intended to compensate her for the firm's actual value.

her fraud claims, Priscilla asserted that while she was negotiating the sale of the firm for both her and the estate's benefit, Schultz and Kellar failed to disclose or only partially disclosed their intentions regarding their agreement to continue to employ her after the sale and their belief that, without a signed employment agreement, they could change the terms of her employment or terminate her after they purchased the firm. Similarly, in support of her negligent-misrepresentation claim, she alleged that Schultz and Kellar supplied false information—namely their promise to employ her after the sale—to her (both individually and as executor) during the sale negotiations.

## C. Applicable law

To prevail on her claims for fraudulent inducement, fraud, and negligent misrepresentation, Priscilla must prove (among other things) that she actually and justifiably relied on Schultz's and Kellar's representations. *See, e.g., Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018) (stating that fraudulent inducement is a "species of common-law fraud that shares the same basic elements" and "arises only in the context of a contract"); *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 & n.15 (Tex. 2010) (op. on reh'g) (stating that fraud and negligent misrepresentation require a showing of actual and justifiable reliance); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997) (stating that fraud by nondisclosure is a subcategory of fraud and that because reliance is an element of fraud, it is likewise an element of fraud by nondisclosure). Justifiable reliance usually presents a fact question for a jury to decide. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas,*

35

*Inc.*, No. 17-0332, 2019 WL 2668317, at *19 (Tex. June 28, 2019) (citing *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 654 (Tex. 2018)).

"In measuring justifiability, we must inquire whether, 'given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part.'" *Grant Thornton*, 314 S.W.3d at 923 (quoting *Haralson v. E.F. Hutton Grp., Inc.*, 919 F.2d 1014, 1026 (5th Cir. 1990)). Justifiable reliance can "be negated as a matter of law when circumstances exist under which reliance cannot be justified." *Orca Assets*, 546 S.W.3d at 654. "To determine whether, as a matter of law, justifiable reliance has been negated, we must consider the contract and the nature of the parties' relationship." *Barrow-Shaver Res.*, 2019 WL 2668317, at *19. Reliance on an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law. *See Orca Assets*, 546 S.W.3d at 658, 660 n.2. "Red flags" that indicate reliance is unwarranted can also negate justifiable reliance as matter of law. *See id.* at 655, 660 n.2.

## D. The summary-judgment evidence

Schultz and Kellar claim that when Priscilla sold them the firm, "there was no agreement as to the terms of an employment agreement between the Firm and Priscilla." In their summary-judgment motion, they argued that Priscilla's reliance on their attorney's representations was not justifiable and that her reliance on her own attorney's representations could not form the basis for her fraud claims against

Schultz and Kellar. But Priscilla did not rely solely on the attorneys' representations. According to her, she also relied on representations made by Schultz and Kellar in the months leading up to the closing.

At the time of Randy's death in February 2013, most of the Stegall Firm's revenue was generated through its title business. After Randy died, Priscilla had multiple options regarding the Stegall Firm: (1) close the firm and sell the firm's assets and use of the rented location and take her book of business and staff to another title company; (2) sell the firm on the open market to another attorney for cash or on a note and stay on as an employee; or (3) close the law firm and convert the business to a direct title operation. But because of the emotional impact of losing her husband and business partner, she decided that it would be best for her to stay with the firm and for the firm to continue to operate as it had before Randy's death. To that end, she approached Schultz and Kellar about buying it.

Over the next few months, Priscilla, Schultz, and Kellar discussed the firm's operations after the sale. They agreed that Priscilla would operate the title business, Schultz and Kellar would run the legal side of the firm, and Priscilla would train Schultz and Kellar in the title business. An accountant advised Priscilla that it would be beneficial from a tax perspective both to her and to Schultz and Kellar if the value of the title business—which included Priscilla's value, the value and continued earning potential of the staff, and the value of any pending closings—was paid through salary and bonus to Priscilla rather than through a "straight sale." Based on this advice,

37

Priscilla told Schultz and Kellar that she "wanted a 10 year guarantee of $150,000 per year" and "wanted to be treated as a silent partner." She justified her demand by pointing out her "ownership and ability to take the whole [title] business where [she] wanted." Schultz and Kellar met privately, and a few days later, Schultz told Priscilla that he and Kellar "were both on board with everything" and suggested that Priscilla "be paid on a percentage of the office production in addition to the salary." Priscilla agreed, and in early March 2013, she "moved forward under this agreement and with this understanding and would not have moved forward toward this goal with [Schultz and Kellar] if they had not agreed to the salary, 10 years[,] and that [she] would be treated as a third partner."

In the months between Randy's death and the sale, Priscilla continued to work at the firm with Schultz and Kellar. By mid-May, Priscilla and Schultz and Kellar had hired lawyers (Sparks and Ruais, respectively) to represent them in the sale. Sparks drafted the sale documents in accordance with the principal terms the parties had negotiated before they retained counsel. Sparks and Ruais negotiated some of the finer terms of the sale and discussed the terms of Priscilla's employment agreement. According to Sparks, the employment agreement "was always something that was contemplated and was important [to all the] parties at some point during the negotiations."

Days before the closing, Priscilla learned that Schultz and Kellar wanted to change the length of her guaranteed employment from ten years to either five or

seven years. She met with Schultz, who told her that both he and Kellar were "nervous" about the ten-year term. Priscilla later met with Schultz and Kellar together, and the parties agreed to "the 150K and percentages and all that remained was the number of years."

According to Priscilla, on the day of the sale (May 29, 2013), she was informed that Schultz and Kellar wanted a five-year contract with a ten-year extension option. Priscilla also alleged that she, Schultz, and Kellar met that day and agreed to a five-year term with an extension option. Later that day, Priscilla sold the firm to Schultz and Kellar for $50,000; the sale was seller-financed with a $50,000 promissory note and included a $100,000 line of credit, both of which were payable to Priscilla as executor and secured by the firm's assets.

The parties did not sign an employment agreement at closing. According to Sparks, he had not drafted an employment agreement to be executed at closing because the parties were still negotiating in the days leading up to the closing, but they insisted on closing as scheduled. Sparks "understood that an employment agreement would be prepared later, on terms discussed between [Priscilla] and the Buyers."

Priscilla knew that when she sold the firm to Schultz and Kellar, she did not have a written employment agreement with them. But at that time, she believed that what she and Schultz and Kellar "had agreed to regarding [her] salary, length of years[,] and bonus structure would be turned into a simple employment agreement

39

after Schultz and Kellar were owners." She based her decision to sell the firm to them on their promise to employ her for at least five years.

Two days after the sale, Priscilla asked Sparks if he had a draft employment agreement for her to review. A week later, Sparks emailed Priscilla to ask "one more time" if she could provide him the information that he needed to finalize the draft of her employment agreement. On June 13, 2013, Sparks sent Priscilla a draft employment agreement; she did not respond to Sparks until July 9. She wanted to meet with him regarding the employment agreement, but he was out of the office and could not meet until later that month. Priscilla "got busy" in July and August with work and family matters, so she and Sparks were unable to meet until September 9. By that time, Priscilla was unhappy with Schultz and Kellar's management of the firm and wanted to leave. She did not tell Sparks to send over the employment agreement that he had prepared because she "did not believe [Schultz and Kellar] would sign it" and because "it contained terms that were never discussed or agreed to that [she] also did not want to sign." Priscilla also felt that "[t]here was no point in having [Sparks] try to negotiate a term employment agreement . . . as [she] had no leverage at that point to not sell them the Firm."

Priscilla admits that she sold the firm to Schultz and Kellar without a written employment agreement in place. But she maintains that at the time of the sale, Schultz and Kellar had agreed to employ her for five years, paying her $150,000 annually plus the agreed-upon bonuses.

**E. Analysis**

In their summary-judgment motion, Schultz and Kellar assert that Priscilla's reliance, if any, was unjustified as matter of law because (1) she could not justifiably rely on representations from their attorney; (2) she knew that any employment agreement would be in writing; (3) she sold them the firm without a written employment agreement; (4) she decided not to present Schultz and Kellar with a proposed written employment agreement; and (5) she knew the parties never contemplated an oral employment agreement.

Viewing the evidence in Priscilla's favor—as we must—and because we measure "justifiability" given Priscilla's "individual characteristics, abilities, and *appreciation of facts and circumstances at or before the time of the alleged fraud*," *see Grant Thornton*, 314 S.W.3d at 923 (emphasis added), Schultz and Kellar did not prove lack of justifiable reliance as a matter of law. There were no "red flags" to indicate that Priscilla's reliance was unwarranted, nor were Schultz's and Kellar's oral representations directly contradicted by the express, unambiguous terms of a written contract.[19] *See Orca Assets*, 546 S.W.3d at 655, 658. According to Priscilla, leading up to

---

[19]On appeal, Schultz and Kellar point to the security agreement's merger clause, which states:

> This Agreement and all documents and instruments executed in connection therewith or herewith, supersede any and all other agreements, either oral or in writing, between the parties hereto with respect to the subject matter hereof and contain all of the covenants and

and at the time of the sale's closing, she relied on Schultz's and Kellar's representations regarding a promise of continued employment. The fact that Priscilla realized after the sale that she lacked the leverage to force them to execute a written employment agreement does not establish—as a matter of law—a lack of justifiable reliance leading up to the sale of the Stegall Firm to Schultz and Kellar. Accordingly, we sustain Priscilla's final issue.[20]

## VII.
## Conclusion

Having sustained Priscilla's fifth issue, we reverse the trial court's judgment on her claims for fraudulent inducement, fraud by nondisclosure, fraud by partial disclosure, and negligent misrepresentation and remand those claims to the trial court. Because the trial court's dismissal of her declaratory-judgment claim as moot was

---

agreements between the parties with respect to the subject matter hereof.

Because Schultz and Kellar did not raise the merger clause as a summary-judgment ground, we decline to address what effect, if any, it has on whether Priscilla's reliance was justified. *See State Farm Lloyds v. Page*, 315 S.W.3d 525, 532 (Tex. 2010) (stating that a "[s]ummary judgment may not be affirmed on appeal on a ground not presented to the trial court in the motion"); *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 681 (Tex. 2000) (concluding that merger-clause defense not raised in the trial court is unpreserved for appellate review).

[20]Whether Priscilla or the estate owns these claims and whether she in her individual capacity could assert them was never determined by the trial court because the trial court dismissed as moot her declaratory-judgment action when it granted summary judgment against Priscilla on all her claims. We thus do not address these issues and leave them for the trial court to determine on remand.

based, in part, on its granting summary judgment on her fraud-based and negligent-misrepresentation claims, we reverse the trial court's dismissal and remand her declaratory-judgment claim as well. Having overruled Priscilla's first four issues, we affirm the remainder of the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: November 21, 2019